## UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| CHARLES FRIEND, | ) | |
| | ) | |
| plaintiff, | ) | JURY TRIAL DEMANDED |
| | ) | |
| v. | ) | Case No. 22 -_____ |
| | ) | |
| TYLER MAHAN, CODY ROSE, and | ) | |
| CHARLES LANE, Each in His Individual | ) | |
| Capacity, JACQUELINE HATHAWAY, and | ) | |
| THE CITY OF DECATUR, ILLINOIS, | ) | |
| | ) | |
| defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiff Charles Friend, by his undersigned counsel, alleges for his

Complaint against defendants Officer Tyler Mahan ("Officer Mahan"), Officer Charles

Lane ("Officer Lane"), and Officer Cody Rose ("Officer Rose"), each in his individual

capacity, Jacqueline Hathaway ("Jackie"), and the City of Decatur, Illinois (the "City" or

"Decatur"), and demands a trial by jury, as follows:

### ALLEGATIONS COMMON TO ALL COUNTS

### The Parties

1.     Plaintiff is a Caucasian male who currently resides, and during all

time periods pertinent to this case resided, at 6092 Janvrin Road, in the City of Decatur

in Macon County, Illinois, and was 53 at the time of the events at issue in this case.

2.     Jackie is a Caucasian female who currently resides, and during all

time periods pertinent to this case resided, in the City of Decatur, Macon County,

Illinois, and also was 53 at the time of the events at issue in this case.

3.      Officer Mahan is a former member of the Decatur Police Department ("DPD") who, during all time periods pertinent to the events at issue in this case, worked as an officer in training for the DPD and was acting in his capacity as a DPD officer.

4.      Officer Lane is a current DPD employee who, during all time periods pertinent to the events at issue in this case, worked as an officer for the DPD and was acting in his capacity as a DPD officer.

5.      Officer Rose is a current DPD employee who, during all time periods pertinent to the events at issue in this case, worked as an officer for the DPD, was training Officer Mahan and was acting in his capacity as a DPD officer.

6.      Decatur (the "City") is a municipality in Macon County, Illinois, with its own police department (the "DPD").

## Jurisdiction and Venue

7.      Federal subject matter jurisdiction exists over this case pursuant to (a) 28 U.S.C. §1331 and 42 U.S.C. §1983 in that a number of the claims in this case arise under federal law — specifically, 42 U.S.C. §1983 and the Fourth Amendment to the United States Constitution, and (b) 28 U.S. Code §1367 in that the state law claims in this case are so related to the claims that arise under federal law that they form part of the same case or controversy under Article III of the United States Constitution.

8.      Venue lies in this federal District pursuant to 28 U.S.C. § 1391(a) in that a substantial portion of the events and omissions at issue in this case occurred in this District.

## Background Facts

### Plaintiff's Relationship with Jackie

9.      On or around the beginning of 2016, plaintiff began dating Jackie.

10.     At the time, plaintiff was in his late 40s, and Jackie was about six months younger than plaintiff.

11.     The two dated on and off for roughly five years, until January 14, 2021, with Jackie living at plaintiff's home in rural Decatur for the last three months of their relationship.

12.     Throughout the relationship, plaintiff spent a significant amount of time with Jackie's daughter from a prior relationship, Taylor Hathaway, a Caucasian female in her late 20s who currently resides, and during all time periods pertinent to this case resided, in the City.

13.     Jackie suffered from active alcoholism during the entire relationship, with Jackie having black-outs and injuring herself with increasing frequency during the latter part of her romantic relationship with plaintiff.

14.     Taylor also suffered from substance abuse issues at the time of the events at issue in this case.

15.     Plaintiff did his best to obtain help for Jackie while also assuming a role in attempting to obtain help for Taylor's substance abuse problems.

16.     Taylor, in turn, began to resent plaintiff for his efforts in this regard, to the point where she wanted Jackie to end the relationship so that Taylor could continue using substances without plaintiff's interference.

17.     On January 14, 2021, the last day of Jackie's and plaintiff's romantic relationship, Jackie moved out of plaintiff's residence and returned to the apartment that she had maintained while living with plaintiff.

18.     On January 16, 2021, plaintiff dropped off Jackie's cat at her apartment, but did not enter or interact with Jackie.

19.     Plaintiff did not see Jackie or Taylor again until March 2021.

**Plaintiff's False Warrantless Arrest**

20.     For the several years prior to the events at issue in this Complaint, plaintiff worked as an employee with the Illinois Department of Transportation, with his office located at 4142 North Westlawn, in Decatur, Illinois.

21.     On February 10, 2021, roughly four weeks after Jackie had left plaintiff's home for the last time, plaintiff left work at 11:05 a.m., drove directly home, approximately seven minutes away from his workplace, entered his house at 11:18 a.m., and did not leave home again until that evening to go to IDOT to plow snow until 7:00 a.m. the following morning.

22.     Two days later, on Friday, February 12, 2021, at approximately 2:00 p.m., plaintiff was at home when he received a call on his cell phone from Michael Hathaway, Jackie's son, who was calling to let plaintiff know that Taylor had taken Jackie to the hospital earlier that day, that Jackie was extremely intoxicated and that, while at the hospital, Jackie apparently had told the police that plaintiff had punched her in the face several times on the morning of Wednesday, February 10.

23.     Plaintiff told Michael, whom plaintiff called "Mick" and who knew about his mom's drinking problems and plaintiff's efforts to help her, that he obviously

4

had not done what Jackie apparently was saying, and that he was sorry he could not do more to help Michael's mom.

24.     Roughly two hours later, plaintiff received a call from Officer Mahan, who (along with Officer Rose) had interviewed Jackie at the hospital, and asked plaintiff whether he would agree to meet with him and other officers at a location within Decatur city limits.

25.     Plaintiff then asked the officer the purpose of the meeting.

26.     Although Officer Mahan already had made the decision that he would be arresting plaintiff, he assured plaintiff that the reason for the meeting was merely (a) to discuss plaintiff's relationship with Jackie, (b) to examine plaintiff's hands to see whether they had bruise marks, and (c) to ascertain plaintiff's whereabouts on February 10, 2021, between 11:00 a.m. and Noon.

27.     Plaintiff had no marks on his hands, knew that Jackie could not have been coherent when she concocted her story about plaintiff beating her, and also knew (as he had discussed with Mick) that Jackie had taken a bad fall on black ice outside her home a few days earlier.

28.     Still, because plaintiff had gone straight home after leaving work on Wednesday, February 10, and thus would not have a witness to verify his whereabout between 11:05 a.m. and Noon, he asked Officer Mahan whether he would need a lawyer with him at their meeting.

29.     When plaintiff asked this question, Officer Mahan already had decided with Officer Rose that they would arrest plaintiff based on the department's

5

policy and practice of always arresting a suspect following a report of domestic violence, regardless of whether they have probable cause to do so.

30.     Officer Mahan also knew that it was DPD's policy and practice to say whatever was necessary to coerce a crime suspect to consent to meeting with officers rather than seek an arrest warrant for an arrest at a suspect's home.

31.     Thus, although Officer Mahan knew that plaintiff would indeed be needing a lawyer because he was going to be arrested, the officer lied to plaintiff and told him that he would not need a lawyer unless he had something to hide.

32.     Before completing the call with the officer, plaintiff asked Officer Mahan to call him back in about six minutes time, so that he could arrive at his mother's house before the police officers and explain to his mother the reason that officers would be visiting her home.

33.     Shortly after the first call with Office Mahan ended, plaintiff arrived at his mother's house.

34.     A few minutes later, Officer Mahan called plaintiff again, and confirmed that plaintiff would be available to meet with him at plaintiff mother's residence.

35.     During these calls, plaintiff informed Officer Mahan that he had left work at 11:05 a.m. on Wednesday, February 10, had arrived home around 11:20 a.m. and had not left the house again until the evening.

36.     Officers Mahan and Rose arrived soon thereafter, but they waited outside for a third officer, Officer Lane, a veteran of the DPD, to arrive as well.

37.     At some point prior to entering the home, the three officers agreed that Officer Mahan would take the lead in the questioning while Officer Lane would assist as needed and Officer Rose would observe until such time as the arrest was nearing, at which point he would wait in the patrol car awaiting Mahan and plaintiff.

38.     When the officers knocked at plaintiff's mother's front door, plaintiff told his mother, based on his assurances from Officer Mahan regarding the purpose of the meeting, that she should allow the officers to enter her home.

39.     Plaintiff's mother then answered the door only because plaintiff told her to do so.

40.     Shortly after entering the home, and engaging in some light banter, plaintiff as well as plaintiff's mother asked Officer Mahan precisely what time Jackie had said that plaintiff's alleged attack occurred on Wednesday, February 10.

41.     Officer Mahan stated that Jackie had specifically said that the attack occurred on February 10, 2021, between 11:00 a.m. and Noon.

42.     Officer Mahan also falsely told plaintiff that he had reviewed Jackie's cell phone call log and that the log indicated that Jackie had called plaintiff at 11:00 a.m. on February 10, and that Jackie had asked plaintiff to come to her home.

43.     Plaintiff then examined his own cell phone call logs, which showed that Jackie had called plaintiff the prior Sunday night, February 7, and then had not called him again until 8:45 p.m. on the evening of Wednesday, February 10 — i.e., the night after the alleged attack had occurred.

44.     At this point, plaintiff became a bit flustered because the only calls that his cell phone reflected between 11:00 a.m. and Noon on February 10 were between

himself and his mother (while he was in his car before entering his home), and then between himself and Walgreens, which he had contacted to obtain medications for a family member, while plaintiff was in his living room at around 11:20 a.m.

45.     Officer Mahan then feigned concern that Jackie's phone records reflected multiple calls between Jackie and plaintiff on Wednesday, February 10, starting at 11:00 a.m., but plaintiff told the officers that could not be true, and that he would like to see those records, because plaintiff <u>never</u> deletes calls from his phone log, whether or not he answers them.

46.     Plaintiff even offered to sign a waiver that would allow the officers to obtain all of his call records directly from his cellphone provider.

47.     At this point, Officer Mahan examined plaintiff's hands and noted that they contained no bruises or any significant markings of any kind, indicating that plaintiff could not have struck anyone within the past several days, and the officer told plaintiff that he was "good."

48.     Nevertheless, a few minutes later, consistent with the officers' decision to arrest plaintiff regardless of what information they learned when they met with him, Officer Mahan read plaintiff his Miranda rights, without arresting him, so that (as he explained to plaintiff) he could continue questioning him.

49.     Officer Mahan then confirmed that plaintiff's position was that plaintiff had left work at approximately 11:00 a.m., gone directly home and arrived at home around 11:20 a.m.

50.     If true — indeed, if only the time of plaintiff's arrival at home was accurate — then plaintiff could not have attacked, or even seen, Jackie at her home

8

between 11:00 a.m. and Noon on February 10 because Jackie lived roughly 20 minutes from plaintiff's work and more than 20 minutes from plaintiff's home when the streets and the skies were clear, and there was snow on the streets on February 10.

51.     At this point, with Officer Mahan's concurrence, plaintiff used his cell phone to log into his home security system.

52.     The video reflected that plaintiff had entered his home at 11:18 a.m., and remained there until he left that evening, thereby eliminating the possibility that he had been at Jackie's home between 11:00 a.m. and Noon.

53.     To remove any lingering doubt as to plaintiff's whereabouts on the day and time in question, Officer Mahan asked plaintiff to verify the times he worked that day.

54.     Plaintiff responded by contacting one of his Lead Workers, John Brownlee, at his home, to ask Mr. Brownlee to swing by their IDOT office and retrieve the information reflecting that plaintiff had arrived at work around 4:00 a.m. and left at 11:05 a.m. that day.

55.     Before plaintiff could explain why he was calling, Officer Mahan asked to speak with Mr. Brownlee directly using plaintiff's personal cell phone, which plaintiff then handed to the officer.

56.     Officer Mahan asked Mr. Brownlee if it were possible to retrieve plaintiff's time records between 4:00 a.m. and 11:05 a.m. on February 10, and bring them to him at plaintiff's mother's home.

57.     After Mr. Brownlee agreed to do so, Officer Mahan returned plaintiff's phone to plaintiff.

9

58.    Plaintiff then informed Officers Mahan and Lane that Mr. Brownlee would need approximately twenty (20) minutes to arrive at the IDOT facility from his home, and then another 10 or so minutes to reach plaintiff's mother's home.

59.    Based on everything he had learned during the meeting with plaintiff, as well as Jackie's intoxicated condition and inconsistent statements during his meeting with her at the hospital, Officer Mahan knew that, even if he had probable cause to arrest plaintiff prior to his meeting with plaintiff, he no longer did so.

60.    By this point, Officer Rose had gone out to the patrol car to await plaintiff's arrest by Officers Lane and Mahan.

61.    Officer Lane, for his part, was unconcerned with what Officer Mahan had learned during the visit because department policy required that they arrest plaintiff and let the prosecutors decide whether to pursue charges.

62.    Officer Mahan then met with Officer Lane outside of plaintiff's earshot and expressed the concern — based on the "time line" of events that he was learning both from plaintiff and from audio-visual and documentary evidence — that he now believed that plaintiff had not even been at Jackie's home on February 10, no less attacked her there.

63.    Officer Lane, however, told Officer Mahan to ignore these concerns, to arrest plaintiff as planned and then to let the court sort out the details.

64.    When Officer Lane made these statements, he knew that he and Officer Mahan were wearing a body camera and recording their discussion.

65.    Officer Mahan then told plaintiff that he was going to be placing him under arrest because it was possible, based on Jackie's intoxicated condition, that

10

she might have been slightly inaccurate about the time of the incident, and that plaintiff's attack might have occurred prior to 11:00 a.m.

66. Yet, with Mr. Brownlee on his way with the evidence that plaintiff had been at work until 11:05 a.m., and thus could not have attacked Jackie at any time after 4:00 a.m. on the morning of February 10, plaintiff asked why they could not wait for Mr. Brownlee to arrive at his mother's home.

67. When Officer Mahan then informed plaintiff that they did not have time to wait for Mr. Brownlee's arrival, plaintiff asked that one of the officers, or the officers and plaintiff, stop at the IDOT office and obtain the time records themselves, before the officers arrested him.

68. Officer Mahan first lied to plaintiff by telling him that the officers could not do so because the IDOT was not within City limits.

69. When plaintiff corrected the officer and explained that the office was within the City, Officer Mahan lied again and said that the officers could not go to the IDOT office before arresting plaintiff because that was not how the arrest process worked.

70. Although plaintiff continued to say that he did not understand why he was being arrested when he could not have been at Jackie's residence on the morning of February 10, and pleaded with the officers to either await Mr. Brownlee's arrival or have at least one of the officers go to the IDOT offices, the officers informed him that, because Jackie's accusations amounted to charges of domestic violence, they had to arrest him.

11

71.     The officers also told plaintiff not to worry and indicated that once the prosecutors reviewed the evidence, they would not bring charges.

72.     The officers — unconcerned with the embarrassment that plaintiff, as a former United States Marine and respected Illinois state employee would suffer — walked plaintiff in handcuffs to their patrol cars that were parked several hundred feet away, rather than having Officer Rose, who was waiting in his patrol car, pull the patrol car up to the home and place plaintiff in it.

73.     Despite plaintiff's confusion as to why he was being arrested when, by this point, the officers knew (and essentially admitted that they knew) that he had not attacked Jackie, plaintiff remained courteous, and even friendly, with the officers, and asked only that they be cautious in placing him in the patrol car because he was suffering excruciating back pain.

74.     The officers then transported plaintiff to the Macon County Jail, one of the more degraded county jails in Illinois, where plaintiff spent 17 hours before being released on bond.

75.     On December 15, 2021, after a two-day jury trial, the jury acquitted plaintiff after only eight minutes of deliberations.

76.     Nevertheless, as a result of the publicity from the incident and plaintiff's position with IDOT, plaintiff spent the 10 months between his arrest and the trial suffering from the suspicions of his friends and co-workers that he had beaten his ex-girlfriend.

77.     Plaintiff also spent nearly $10,000 defending himself against the charges that he had beaten Jackie.

12

78.     Plaintiff continues to suffer the trauma and embarrassment of the arrest to this day.

**The False Accusations against Plaintiff**

79.     On or about February 10, 2021, Jackie took a bad fall on black ice in the driveway of her Decatur apartment and struck her knee and face on the ground.

80.     Around noon on February 12, one of Jackie's co-workers, Ken Fisher, arrived at her apartment to pick her up for work.

81.     Upon entering Jackie's apartment, Mr. Fisher saw Jackie's facial injuries, and detected that she was intoxicated, so he called Jackie's daughter, Taylor, and asked her to come to her mother's apartment as soon as possible.

82.     When Taylor arrived, she discovered that her mother was both injured and severely intoxicated, and asked her what had happened.

83.     Jackie's intoxication was so severe, however, that she could not explain how she had sustained the injuries.

84.     Seeing an opportunity to punish plaintiff for his interference with Taylor's drug use and for ending the relationship with Jackie, Taylor decided to blame plaintiff for Jackie's injuries.

85.     Taylor then called 911 and reported that, on February 10, plaintiff had sexually assaulted and beaten Jackie.

86.     Based on the call, the 911 operator dispatched both the police and emergency medical technicians ("EMTs") to Jackie's home.

87.     DPD Officers Claypool and Clark arrived at Jackie's home after the EMTs, and took a statement from Taylor in which Taylor continued to blame plaintiff

13

for Jackie's injuries while Jackie, despite being visibly intoxicated, did her best to confirm Taylor's version of events.

88.     During his brief interaction with Jackie prior to Jackie's departure for the hospital with the EMTs, Officer Claypool noted that Jackie was drunk and unable to walk or speak clearly.

89.     Meanwhile, Officers Mahan and Rose headed straight to the emergency room at Decatur Memorial Hospital to meet with Jackie and Taylor.

90.     At the hospital, Jackie was so intoxicated that it took the officers roughly two hours to obtain a statement from her.

91.     While giving her statement, Jackie often changed her story, sometimes saying that plaintiff had beaten her and other times saying that he had not done so and that they should not arrest him.

92.     Nevertheless, as alleged above, upon leaving the hospital, the officers made the decision to arrest plaintiff while coercing him into meeting with them so that they could attempt to obtain evidence from plaintiff to bolster their justification for arresting him.

**The False OP and Criminal Cases.**

93.     On or about February 24, 2021, Jackie filed a petition (the "OP Petition") for an order of protection (and "OP") against plaintiff based on the same false allegations of an attack that had resulted in plaintiff's unlawful arrest.

94.     At or around the same time, an Assistant Illinois State's Attorney for Macon County (the "ASA"), at Jackie's urging, filed a criminal case against plaintiff in which the ASA charged plaintiff with assaulting Jackie on February 10, 2021.

14

95.     At the first hearing on the OP Petition, the Court granted a motion by the plaintiff to continue the proceedings until the criminal case was resolved.

96.     Shortly thereafter, Jackie learned of the evidence that rendered it impossible for plaintiff to have been at her apartment on the morning of February 10, so she amended her OP Petition to allege that plaintiff had attacked her on the evening of February 7, 2021.

97.     The ASA then amended the criminal charges to allege that plaintiff had assaulted plaintiff on February 7, 2021.

98.     The ASA knew that he could not obtain a conviction against plaintiff, but he attempted to convince plaintiff to plead guilty to a lesser charge so that plaintiff would be unable to sue the officers for false arrest, but when plaintiff declined to plead guilty to any charge, the ASA took him to trial.

99.     As alleged above, after a two-day trial, the jury returned a not guilty verdict after just eight minutes of deliberations.

100.     The Court then dismissed the OP Petition with prejudice.

## CAUSES OF ACTION

### COUNT I
*Warrantless Arrest against Officers Mahan, Lane and Rose*
(42 U.S.C. §1983; Fourth Amendment)

101.     Plaintiff repeats and restates the foregoing Allegations Common to All Counts as if fully recited again here.

102.     At the time that Officer Mahan called plaintiff on his cell phone and asked that they meet, Officers Mahan, Rose and Lane (the "Arresting Officers")

intended to arrest plaintiff based on the statements Jackie made at the hospital and the injuries they observed there.

103.    Irrespective of whether the officers had probable cause to arrest plaintiff based on Jackie's statements, the officers needed an arrest warrant to enter the home at which plaintiff was located.

104.    The Arresting Officers neither sought nor obtained an arrest warrant prior to arresting plaintiff at his mother's home.

105.    Accordingly, the Arresting Officers' arrest of plaintiff violated plaintiff's rights under the Fourth Amendment to the United States Constitution to be free from warrantless home arrests.

106.    As heretofore alleged in this Complaint, plaintiff suffered substantial financial and emotional damages as a result of his warrantless arrest.

WHEREFORE, plaintiff is entitled to a judgment against the Arresting Officers, and each of them, for compensatory and punitive damages, and for plaintiff's reasonable attorney's fees incurred in enforcing his rights under the Fourth Amendment.

## COUNT II
### *Warrantless Arrest against the City of Decatur*
### (42 U.S.C. §1983; Fourth Amendment)

107.    Plaintiff repeats and restates the Allegations Common to All Counts as if fully recited again here.

108.    At the time of plaintiff's arrest in February 2021, DPD had a policy and practice of allowing and training its officers to evade their obligations under the

Fourth Amendment's warrant requirement by using subterfuge, including (among other things) lies and deception, to obtain an arrestee's consent to a warrantless home arrest.

109.    Among the most frequent forms of subterfuge that DPD's policy and practice authorized and encouraged was to inform intended arrestees that the police wanted to meet with them not to arrest him, but to investigate a report of criminal conduct.

110.    Consistent with this policy and practice, when Officer Mahan contacted plaintiff at his home, and asked to meet with him, and plaintiff asked the purpose of the visit, the officer told plaintiff not that the reason for the requested meeting was to arrest plaintiff, but instead that the reasons were (a) to discuss plaintiff's relationship with Jackie, (b) to examine plaintiff's hands to see whether they had bruise marks, and (c) to ascertain plaintiff's whereabouts on February 10, 2021, between 11:00 a.m. and Noon.

111.    Plaintiff reasonably understood this explanation for the visit as meaning that, if he did not have marks on his hands, and could demonstrate that he was not at Jackie's home during the identified time frame, then he would not be arrested.

112.    Still, to be sure that his understanding of Officer Mahan's comments was correct, plaintiff then asked Officer Mahan whether he would need a lawyer, since a person who is being arrested not only needs, but has a constitutional right to, to a lawyer.

113.    Nevertheless, in order to avoid the need to obtain an arrest warrant, and consistent with the DPD's policy and practice, Officer Mahan falsely

17

answered plaintiff's question by stating that, if plaintiff had nothing to hide, then he would not need an attorney.

114.    Based on these assurances, plaintiff consented to meeting with the officer at his mother's home.

115.    As a result of Officer Mahan's false and misleading statements, (a) plaintiff agreed to meet with the officer at his mother's home, (b) the Arresting Officers did not obtain an arrest warrant for plaintiff on February 12, 2021, and (c) plaintiff suffered the injuries arising from his warrantless arrest described above.

WHEREFORE, plaintiff is entitled to a judgment against the City (i) for compensatory damages arising from his arrest, (ii) for plaintiff's reasonable attorney's fees incurred in enforcing his rights under the Fourth Amendment, and (iii) for an injunction requiring DPD to change its policy and practice of allowing and training officers to use lies and deception to coerce consent for warrantless home arrests.

## COUNT III
### *False Arrest/Lack of Probable Cause*
### *Against Officers Mahan, Lane and Rose*
### (42 U.S.C. §1983; Fourth Amendment)

116.    Plaintiff repeats and restates the foregoing Allegations Common to All Counts as if fully recited again here.

117.    At the time that the Arresting Officers arrested plaintiff, they knew that plaintiff had not attacked Jackie on the morning of February 10, and that they lacked probable cause to arrest him for such an attack.

118.    Indeed, not only did the officers know that plaintiff could not have attacked Jackie during the very time period that she had alleged that plaintiff had done

so, but they rushed to consummate the arrest before Mr. Brownlee arrived with the evidence that plaintiff could not have arrested plaintiff at any time on the morning of February 10, and declined to go with plaintiff (or without) to plaintiff's IDOT office where they would have obtained the definitive evidence of plaintiff's innocence.

119.    Accordingly, the officers' conduct violated plaintiff's right to be free from an unreasonable seizure of his person under the Fourth Amendment.

120.    Plaintiff suffered substantial financial, physical and emotional damage on account of the arrest, including more than $10,000 in legal fees and expenses that plaintiff had to expend to exonerate himself, physical suffering from a back condition that left plaintiff nearly unable to enter the police car while handcuffed, humiliation of spending 17 hours in a degraded local jail cell and the further embarrassment of and loss of friends resulting from plaintiff's arrest for beating a woman.

WHEREFORE, plaintiff is entitled to a judgment against the Arresting Officers for compensatory and punitive damages, and for plaintiff's reasonable attorney's fees incurred in enforcing his rights under the Fourth Amendment.

## COUNT IV
### *False Arrest/Lack of Probable Cause*
### *Against the City*
### (42 U.S.C. §1983; Fourth Amendment)

121.    Plaintiff repeats and restates the foregoing Allegations Common to All Counts as if fully recited again here.

122.    The reason that the Arresting Officers arrested plaintiff without probable cause is the policy and practice of DPD that in cases of alleged domestic

violence, the officers must make an arrest, and then leave it to the State's attorneys to decide whether to bring charges.

123.    Were it not for this policy and practice, the officers would not have arrested plaintiff on February 12, 2021, because they knew that plaintiff could not have committed the crime of which Jackie had accused him.

124.    Plaintiff suffered substantial financial, physical and emotional damage on account of the arrest, all as more fully set forth in Count III above.

125.    WHEREFORE, plaintiff is entitled to a judgment against the City (i) for compensatory damages arising from his arrest, and for plaintiff's reasonable attorney's fees incurred in enforcing his rights under the Fourth Amendment, and (ii) for injunctive relief requiring DPD to change its policy and practice of requiring officers to make an arrest based on accusations of domestic violence regardless of whether probable cause exists for the arrest.

## COUNT V
### *Malicious Prosecution against Jackie*

126.    Plaintiff repeats and restates the foregoing Allegations Common to All Counts as if fully recited again here.

127.    When Jackie and Taylor met with Officer Mahan and Officer Rose at the hospital on February 12, 2021, they both knew that Jackie had suffered all of the injuries she reported to the officers as a result of a fall on black ice at some point between February 7 and February 10, 2021.

128. Both women also knew that Jackie had not seen or had any physical interaction with plaintiff during the weeks prior to their February 12, 2021, meeting with the officers.

129. Nevertheless, Jackie proceeding with her OP Petition as well as plaintiff's criminal prosecution, and even changed their story about the date on which the incident occurred, because the she still resented plaintiff's termination of his relationship with her.

130. Plaintiff suffered severe financial and emotional damages from the prosecutions of the petition for the order of protection and the criminal prosecution.

131. Jackie's conduct in procuring the prosecution of plaintiff for allegedly beating her was wanton, willful and outrageous in the light of plaintiff's innocence and the impact on his reputation as an ex-Marine and State worker.

WHEREFORE, plaintiff is entitled to a judgment against Jackie for compensatory and punitive damages in maliciously causing the prosecution of plaintiff through her knowingly false and inconsistent allegations.

## <u>CONCLUSION</u>

WHEREFORE, plaintiff prays that, following a trial by jury, this Court enter judgment for plaintiff and against the respective defendants under Counts I through V above, for compensatory and punitive damages, as applicable, and for such other and further relief as the Court may deem just and proper.

Dated: October 21, 2022

Respectfully submitted,


By:  /s/ Jonathan A. Backman
          Jonathan A. Backman


Jonathan A. Backman (ID #6196243)
Law Office of Jonathan A. Backman
117 North Center Street
Bloomington, Illinois 61701-5001
(309) 820-7420
FAX: (309) 820-7430
jbackman@backlawoffice.com

*Attorney for Plaintiff Charles Friend*